**PLAYBOY ENTERTAINMENT GROUP, INC., and Graff–Pay–Per–View Inc., Plaintiffs**

v.

**UNITED STATES of America, United States Department of Justice Janet Reno, Attorney General, and the Federal Communications Commission, Defendants.**

Civil Action Nos. 96–94, 96–107–JJF.

United States District Court, D. Delaware.

Nov. 8, 1996.

A. Gilchrist Sparks, III, and Katharine R. Witherspoon, of Morris, Nichols, Arsht & Tunnell, Wilmington, DE (Burton Joseph, of Barsy, Joseph & Lichtenstein, Chicago, IL, Robert Corn–Revere, Jean S. Moore, Ronald J. Wiltsie, II, of Hogan & Hartson L.L.P., Washington, DC), for Plaintiff, Playboy Entertainment Group, Inc.

William D. Johnston, and John W. Shaw, of Young, Conaway, Stargatt & Taylor, Wilmington, DE (Charles S. Sims, and John Siegal, of Proskauer Rose Goetz & Mendelsohn LLP, New York City, Daniel Barsky, Graff Pay–Per–View Inc., New York City), for Plaintiff, Graff Pay–Per–View Inc.

Gregory M. Sleet, United States Attorney, Patricia Hannigan, Assistant U.S. Attorney, John J. Polk, Assistant U.S. Attorney, Wilmington, DE; Frank W. Hunger, Assistant Attorney General, Dennis G. Linger, Theodore C. Hirt, James J. Gilligan, Joseph V. Jest, and Sarah L. Wilson, of the United States Department of Justice, Civil Division, Federal Programs Branch, Washington, DC; (Daniel M. Armstrong, Associate General Counsel, Susan Fox, Office of the General Counsel, Federal Communications Commission), for Defendants.

Robert J. Katzenstein, of Smith, Katzenstein & Furlow, Wilmington, DE (Michael A. Bamberger, and Margaret A. Jacobs, of Sonnenschein Nath & Rosenthal, New York City), for Amici Curiae, American Booksellers Foundation for Free Expression, Association of American Publishers, Counsel for Periodical Distributors of The Americas, Feminists for Free Expression, Freedom to Read Foundation, Interactive Digital Software Association, International Periodical Distributors Association, Motion Picture Association of America, Inc., National Association of College Stores, Inc., National Association of Recording Merchandisers, Periodical and Book Association of America, Inc., Publishers Marketing Association, of America, Inc., and Video Software Dealers Association.

. Henry N. Herndon, Jr., and Eric D. Schwartz, of Morris, James, Hitchens &

Williams, Wilmington, DE (Patrick D. Maines, of The Media Institute, Washington, DC; Robert M. O'Neill, and Joshua Wheeler, of The Thomas Jefferson Center for Protection of Free Expression, Charlottesville, VA), for Amici Curiae, Thomas Jefferson Center for The Protection of Free Expression and The Media Institute.

Before: ROTH [1], Circuit Judge, FARNAN [2] and SIMANDLE [3], District Judges.

## OPINION

ROTH, Circuit Judge:

The plaintiffs in this action, Playboy Entertainment Group, Inc. ("Playboy") and Graff Pay–Per–View ("Graff"), challenge the constitutionality of section 505 of the Communications Decency Act of 1996 ("the CDA" of "the Act"), which is Title V of the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56. Congress enacted section 505 in an effort to eliminate signal bleed, i.e., the partial reception of sexually explicit adult cable television programming in the homes of non-subscribers to that programming.

Most cable television systems in the United States offer one or more optional premium channels dedicated to sexually oriented programming. However, of the 62 million households that subscribe to cable television, only about 3 million will purchase or subscribe to adult programming during the course of a year. Cable system operators attempt to block non-subscribers from receiving this programming by various scrambling techniques which we will explain in greater detail in our Findings of Fact. Signal bleed occurs when the scrambling process is not fully successful.

The stated purpose of section 505 is to protect children from signal bleed. Section 505(a) requires a cable television operator to completely scramble or block the video and audio portions of any cable channel that is primarily dedicated to sexually explicit programming. If a cable operator is unable to comply in full with section 505(a), then section 505(b) requires "time channeling", i.e., that sexually explicit adult programming be transmitted only during those hours when children are not likely to view it. The Federal Communications Commission has determined these "safe harbor" hours to be from 10:00 p.m. to 6:00 a.m.

The principal issue facing us is whether government regulation of signal bleed from sexually explicit programming offends the free speech and equal protection rights of adult-programming networks and of their subscriber audience. Our analysis is narrowed by the fact that plaintiffs do not contend that signal bleed itself is protected speech. Moreover, plaintiffs concede that their programming is essentially 100% sexually oriented, in contrast to other entertainment channels that display only occasional or sporadic sexually explicit scenes or programs. Nevertheless, because the regulatory scheme of section 505 impacts on the transmission of adult programming, which is entitled to First Amendment protection,[4] we will examine whether section 505 is a content-based restriction of speech, and, if so, whether it survives scrutiny by addressing a compelling interest and by being narrowly tailored for that end. We will also consider whether Congress has unconstitutionally singled out networks that are exclusively dedicated to sexually oriented programming,

1. Judge Jane R. Roth, United States Circuit Court Judge for the Third Circuit.

2. Judge Joseph J. Farnan, United States District Court Judge for the District of Delaware.

3. Judge Jerome B. Simandle, United States District Court Judge for the District of New Jersey.

4. We recognize at the outset that the programming on plaintiffs' sexually dedicated channels is indecent, meaning vulgar or offensively explicit sexual material not generally available for viewing by children, but that it is not obscene. Inde-

cent speech is subject to constitutional protection because it is established that "[s]exual expression which is indecent but not obscene is protected by the First Amendment." *Sable Communications of Cal., Inc. v. F.C.C.,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989); *Fabulous Associates Inc. v. Pennsylvania Public Utility Comm'n,* 896 F.2d 780, 783 (3d Cir.1990); *Action for Children's Television v. F.C.C.,* 58 F.3d 654, 659 (D.C.Cir.1995) (en banc), *cert. denied,* —— U.S. ——, 116 S.Ct. 701, 133 L.Ed.2d 658 (1996); accord, *ACLU v. Reno,* 929 F.Supp. 824 (E.D.Pa.1996), at 851 (Sloviter, J.), at 858 n. 3 (Buckwalter, J.), and at 865–66 (Dalzell, J.).

while not regulating signal bleed from other premium networks that at times will transmit sexually oriented programs or scenes. Finally, we will examine plaintiffs' claim that the language of section 505 is unconstitutionally vague.

## I.

## PROCEDURAL BACKGROUND

President Clinton signed the CDA into law on February 8, 1996. On February 26, Playboy filed this action in the United States District Court for the District of Delaware, seeking a declaratory judgment that § 505 violates the First Amendment and the Equal Protection Clause of the Fifth Amendment of the U.S. Constitution. In addition, Playboy sought injunctive relief that would prohibit enforcement of § 505 by the Government.[5] Graff subsequently filed an action seeking identical relief against the same defendants. On March 4, 1996, Judge Farnan granted Graff's motion to consolidate these actions pursuant to Federal Rule of Civil Procedure 42(a). That same day, Chief Judge Dolores K. Sloviter of the United States Court of Appeals for the Third Circuit granted the parties' request to appoint a three-judge district court pursuant to § 561(a) of the CDA. She named Judge Joseph P. Farnan of the U.S. District Court for the District of Delaware, Judge Jerome B. Simandle of the U.S. District Court for the District of New Jersey, and Judge Jane R. Roth of the U.S. Court of Appeals for the Third Circuit.[6]

Because the CDA was to go into effect on March 9, 1996,[7] Playboy requested a temporary restraining order ("TRO") to enjoin implementation and enforcement of § 505 of the Act. On March 6, 1996, Judge Farnan heard oral argument on Playboy's TRO motion.[8] He granted Playboy's motion on March 7, 1996, temporarily enjoining enforcement of § 505 until the matter could be heard by the three judge panel appointed by Chief Judge Sloviter. *Playboy Entertainment Group, Inc. v. United States,* 918 F.Supp. 813 (D.Del.1996).

In preparation for our consideration of the plaintiffs' Application for a Preliminary Injunction, the parties negotiated a mutually acceptable discovery and briefing schedule. Much of the factual and technical evidence was presented by affidavits and briefs submitted prior to the preliminary injunction hearing. We heard testimony on May 20 and May 21, 1996, and closing arguments were presented on May 22. We concluded that we should delay our decision until after the Supreme Court's decision in *Alliance for Community Media v. F.C.C.,* 56 F.3d 105 (D.C.Cir.1995). The Supreme Court published its decision on June 28, 1996, *sub nom., Denver Area Educational Telecommunications Consortium v. F.C.C.,* —— U.S. ——, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996). The

---

**5.** The defendants in this action are the United States; the United States Department of Justice; Attorney General of the United States, Janet Reno; and the Federal Communications Commission ("the FCC"). To simplify matters, we will refer to these defendants jointly as "the Government."

**6.** Section 561(a) of the CDA provides that a three judge district court shall be convened to decide "any civil action challenging the constitutionality, on its face, of this title or any amendment made by this title ... pursuant to the provisions of section 2284 of title 28, United States Code." Pub.L. No. 104–104, § 561(a), 110 Stat. 56, 142 (1996). Section 2284 requires that at least one of the judges appointed to serve on the three-judge panel be a circuit judge.

**7.** Pursuant to § 505(b), section 505 was set to go into effect on March 9, 1996, thirty days after it was signed into law by the President. Pub.L. No. 104–104, § 505(b), 110 Stat. 56, 136 (1996).

**8.** Section 2284(b)(3) delineates the preliminary matters that may be decided by a single judge from those matters that must be decided by three-judge district courts. That section provides:

A single judge may ... grant a temporary restraining order on a specific finding, based on evidence submitted, that specified irreparable damage will result if the order is not granted, which order, unless previously revoked by the district judge, shall remain in force only until the hearing and determination by
the district court of three judges of an application for a preliminary injunction. A single judge shall not ... hear and determine any application for a preliminary or permanent injunction.... Any action of a single judge may be reviewed by the full court at any time before final judgment.
28 U.S.C. § 2284.

parties then submitted supplemental memoranda, as we had instructed, on the impact and applicability of the Supreme Court's decision.

## II.

## FINDINGS OF FACT

In order to understand fully the arguments made by the parties in this case, it is necessary to understand the technological workings of cable signals and transmission. During the preliminary injunction hearing, the court heard extensive and complex testimony regarding cable technology and the mechanisms available to comply with § 505. Pursuant to Federal Rule of Civil Procedure 52(a), we make the following findings of fact:

### The Statute At Issue

1. Playboy and Graff challenge § 505 of the CDA, entitled "Scrambling of Sexually Explicit Adult Video Service Programming." This section requires a multisystem operator ("MSO")[9] to scramble "sexually explicit adult programming or other programming that is indecent" which is transmitted on a channel "primarily dedicated to sexually oriented programming." Section 505 requires that any such adult channel or network be fully scrambled. The purpose of this scrambling is to eliminate "signal bleed." "Signal bleed" is the partial reception of video images and/or audio sounds on a scrambled channel. If an MSO does not or cannot comply with § 505's blocking requirement, the MSO is prohibited from transmitting the adult programming during hours of the day when minors are most likely to view it.[10]

9. Section 505 applies to "multichannel video programming distributors." These distributors are more simply known as "multisystem operators" or "MSOs" and we will refer to them in this manner.

10. Section 505 provides:
   (a) REQUIREMENT.—In providing sexually explicit adult programming or other programming that is indecent on any channel of its service primarily dedicated to sexually-oriented programming, a multichannel video programming distributor shall fully scramble or otherwise fully block the video and audio portion of such channel so that one not a subscriber to such channel or programming does not receive it.

2. MSOs, such as Telecommunication, Inc. ("TCI") and Time Warner Cable, provide cable subscribers with various packages of cable channels for which subscribers pay a monthly fee. Some subscribers receive a "basic" package or "tier" of channels. A basic cable tier often includes local broadcast networks (like ABC, CBS, and NBC), leased and public access channels, as well as networks devoted entirely to news, education, fine arts, music videos, sports, or shopping. MSOs also provide "premium" tiers, which offer, in addition to the basic tier channels, channels showing recently released movies (like HBO, Cinemax, and Showtime) and channels dedicated solely to adult entertainment. MSOs charge a monthly fee for a basic cable package and additional monthly fees for premium cable channels.

3. Premium programming is also offered by MSOs on a "pay-per-view" basis. A pay-per-view consumer places an order with a cable operator, requesting access to a particular movie or sporting event. A consumer may also purchase programming on a premium channel for a specified period of time. When a consumer places a pay-per-view order, the MSO at the beginning of the requested program unscrambles the signal by remote accessing of a converter/descrambler box in the subscriber's home. The MSO rescrambles the signal at the conclusion of the program. The fee charged for receiving a program on a pay-per-view basis is always in addition to monthly fees paid for a cable package.

4. Playboy and Graff provide MSOs with adult, sexually oriented video programming.

   (b) IMPLEMENTATION.—Until a multichannel video programming distributor complies with the requirement set forth in subsection (a), the distributor shall limit the access of children to the programming referred to in that subsection by not providing such programming during the hours of the day (as determined by the Commission) when a significant number of children are likely to view it.
   (c) DEFINITION.—As used in this section, the term 'scramble' means to rearrange the content of the signal of the programming so that the programming cannot be viewed or heard in an understandable manner.
   Pub.L. No. 104–104, § 505, 110 Stat. 56, 136 (1996) (to be codified at 47 U.S.C. § 561).

The MSOs then transmit the plaintiffs' programming to premium subscribers and pay-per-view purchasers who request access to such programming. Playboy owns two adult-programming networks: Playboy Television and AdulTVision. Graff also owns two adult networks: Adam & Eve and Spice. The programming on the Playboy and Graff networks is virtually 100% sexually explicit adult programming. In marketing its programming, Playboy relies on both premium subscription and pay-per-view sales, while Graff relies almost entirely on pay-per-view. On a yearly basis, 3 million households subscribe to and/or receive pay-per-view sexually explicit adult programming.

5. Other non-adult premium networks have obtained licenses to exhibit particular Playboy films. In addition, non-adult premium and basic cable channels will, among other programs, transmit sexually explicit programs or programs which contain some sexually explicit scenes. We received evidence of the frequency of sexually explicit programming on non-adult channels. It was demonstrated for example that the number of sexually explicit programs available on non-adult channels on the evening of Friday, May 17, 1996, in Denver, Colorado, was one sixteenth that shown on the plaintiffs' adult channels. Moreover, unlike the adult channels, the sexually explicit programs on non-adult channels were mainly "R" rated movies which contained some sexually explicit scenes but were not continuously sexually explicit as was plaintiffs' programming.

6. MSOs receive signals from many sources, such as master antennas, satellites, and local television stations. The signals are received at the system transmitter or "head-end" where they are amplified and retransmitted by coaxial cable. Cable subscribers receive the channels directly by cable, if they own a cable-ready television, or by attaching the cable to a converter box if they own a non-cable-ready television.[11]

7. Because the cost of premium and pay-per-view programming is in addition to the cost of basic programming, MSOs seek to secure premium network signals for subscribers only. To prevent a signal from reaching the home of a non-subscriber, MSOs "scramble" the signal by blocking a portion of it. Currently, most MSOs scramble premium channel signals using either "RF" or "baseband" technology. Generally, this scrambling affects only the video portion of the transmission.[12]

8. When a consumer decides to subscribe to a premium or pay-per-view channel, the MSO must descramble the channel for the new subscriber. This can be done either by installing a positive or negative trap in the coaxial cable leading to the new subscriber's home or by providing the new subscriber with an addressable converter. The trap or the addressable converter descrambles the signal so that the integrity of the image and/or the sound is restored in the set or sets attached to the descrambled line. The MSO can remotely "address" an addressable converter by sending out an electrical impulse. Addressable converters make pay-per-view requests possible by enabling an MSO by remote direction to descramble and then res-

---

**11.** A converter box sits on top of an older model television set which can receive only a finite number of VHF or UHF channels. The converter takes the cable signal and converts it to a channel which can be received by the subscriber's television set. When cable systems began to offer programming, other than local broadcast stations, on channels that television sets designed for broadcast reception were not capable of receiving, MSOs began to distribute these converter boxes to their subscribers. Converter boxes are electronic channel selectors. They are connected both to the subscriber's TV set and to the MSO's cable line. When a subscriber chooses a cable channel to view, the box "converts" the selected channel to a frequency (typically broadcast television channel three or four) that the subscriber's TV set can receive and display.

In about 1980, TV set manufacturers began marketing "cable-ready" TV sets, units equipped with tuners capable of directly receiving cable programming transmitted on non-broadcast (cable only) frequencies. If a subscriber has a cable-ready TV set, and it is capable of tuning all the channels offered by the cable system, the subscriber's line can be connected directly to the TV set.

**12.** Because RF affects only the picture portion of the television transmission, no audio scrambling occurs. Some baseband systems do include audio encryption so that no intelligible audio will be presented to the non-subscribing customers.

cramble the cable signals entering the subscriber's home.[13]

9. As mentioned above, one of the technologies used by MSOs to secure premium channels is "positive trapping." For positive trapping, the MSO installs at its transmitter headend an electronic box which jams the signal of the ·channel to be secured. Nonsubscribers to that channel will receive only "snow" for video and a high-pitched beep for audio. Subscribers to the jammed channel receive a metal cylinder, the positive trap, which is attached to the cable-ready TV or to the set top converter box in order to filter out the jamming signal.

10. A premium channel's signal can also be secured by "negative trapping." Using this technology, the signal will be transmitted in the clear. A negative trap is installed at the homes of non-subscribers, jamming the signal there.

11. An MSO's choice between using positive or negative trapping will depend on whether the majority of subscribers to the overall cable service also wish to subscribe to a particular premium service. It is cost effective to use negative traps only when a large majority of the customers of a cable system subscribe to a particular premium channel.

12. The problem which § 505 was enacted to remedy is known as "signal bleed." Audio or video "bleed" occurs when a signal is not effectively scrambled by the MSO's RF or baseband equipment. Bleeding does not occur in TV sets with converter boxes that have a feature known as channel mapping.[14] Cable-ready television sets, however, do not include this mapping feature. When a consumer with a cable-ready TV tunes to a scrambled premium channel to which the consumer does not subscribe, the consumer receives the jammed signal which under some circumstances includes a video picture or portions of a picture because of a phenomenon called random lockup. The non-

subscribing consumer will also receive a clear audio signal unless the MSO's scrambling system is one which scrambles the audio.[15] The severity of this signal bleeding problem varies from time to time and from place to place. The reason for these inconsistencies may be weather extremes, faulty or old equipment, or human error in installing, operating, and/or maintaining systems. Moreover, according to plaintiffs' expert, Dr. Walter Ciciora, the cable-ready TV's that pervade the market today have improved electronic circuitry which will make a discernible picture out of a partly-scrambled signal. This technology, developed over the past two decades, permits the child of a cable subscriber to tune the cable-ready TV to a premium or pay-per-view channel offered on the cable system and to receive discernible images even though the parent is a non-subscriber to that channel.

13. With this incidence of improved electronic technology and/or partially scrambled signals, a non-subscriber may see and hear portions of a channel or program to which he or she does not subscribe. This result is of particular concern when the programming is sexually explicit, intended for an adult-only audience. Families, who do not subscribe to adult entertainment channels, have found that sounds and images from these channels are at least partially discernible. The government presented anecdotal evidence of parents discovering that their children have been exposed to sights and sounds from sexually explicit programming only after the exposure had occurred. This evidence included affidavits from several parents testifying about the danger in their homes of signal bleed from adult programming networks. Other parents complained that, even though their own sets were attached to lockboxes that fully blocked indecent programs, their children were exposed to signal bleed from adult programming when they visited friends. Anecdotal evidence of signal bleed

---

13. The previously described converter box and the addressable· converter/descrambler can be combined in one set top box.

14. When a consumer with a converter box attempts to tune a scrambled channel, the converter box will not tune that channel but will tune to

another channel, providing either a promotional message or a blue screen.

15. A subscriber will of course receive the descrambled video and audio.

was also presented in letters which had been sent to various members of Congress and were made part of the record before this court. In addition, video tapes of sexually explicit signal bleed were admitted into evidence. For instance, Defendant's Exhibit No. 4 was taped from the Playboy Channel in Orange, California. Exhibit No. 4 shows partially scrambled images of a nude woman caressing herself and then of two nude women in the water and in a boat, caressing each other. Defendant's Exhibit No. 5 is an audio tape of the Spice Channel, made by a non-Spice subscriber from the audio bleed. It carries the sounds of what appear to be repeated sexual encounters accompanied by assorted orgiastic moans and groans.

14. There are approximately 62 million households in the United States which receive cable television. Of these, 20 to 25 million have converter boxes to receive basic and/or premium cable service. These converter boxes will map out the scrambled channels and as a consequence these households will not receive "signal bleed." The other 40 million cable subscribers have the potential for a "bleed" problem. It is not clear how many of these 40 million cable homes with the potential for "signal bleed" will not in fact receive signal bleed either because the local MSO employs effective baseband or digital scrambling or because the household is already a subscriber to the adult channels.[16] No evidence was presented of any consumer desire to receive "signal bleed." Moreover, plaintiffs make no claim that "signal bleed" itself is constitutionally protected.

### Legislative History of § 505

15. On June 12, 1995, after hearings and substantial debate had been held regarding the legislation that was to become the 1996 Telecommunications Act, Senator Diane Feinstein of California and Senator Trent Lott of Mississippi offered Amendment 1269 which ultimately became Section 505 of the Act. Their amendment proposed that MSOs, offering adult programming, should be required to completely scramble the audio and

video signals to prevent partial reception of those channels in the homes of nonsubscribers.

16. Senator Feinstein told members of the Senate that "[p]arents ... come home after work only to find their children sitting in front of the television watching or listening to the adult's-only channel, a channel that many parents did not even know existed." Cong.Rec. S8167; *see* Playboy Ex. 20. She noted that guidelines which put the burden on the subscriber to request complete scrambling of adult channels were inadequate because often nonsubscribers are unaware that indecent audio and/or video signals can be received. *Id.* The object of the amendment, she said, was to "protect[ ] children by prohibiting sexually explicit programming to those individuals who have not specifically requested such programming."

17. Senators Feinstein and Lott each spoke briefly about their proposed amendment. 141 Cong.Rec. S8166–S8169. Accompanying the transcript of their statements before the Senate was a memorandum from the American Law Division ("ALD") of the Congressional Research Service. The memorandum analyzed the Feinstein–Lott amendment in light of First Amendment case law and concluded that some language contained in the provision might be unconstitutional and over broad. *Id.* at S8168. Except for the statements of Senators Feinstein and Lott, there was no debate on the amendment and no hearings were held on it. The amendment passed easily in the Senate (91 votes in favor; none opposed) and became § 505 of the bill that emerged from the conference which ironed out the differences between the House and Senate versions. On February 8, 1996, President Clinton signed the bill into law.

18. Section 505 does not eliminate adult programming. Instead, it offers MSOs either the option of fully scrambling the video and audio signals of adult programming or, if complete scrambling is not possible or is not the choice of the MSO, the option of transmitting adult programs only during the "safe

---

**16.** If at the trial on the permanent injunction more specific evidence of the number of households with the potential for signal bleed were to

be presented, we would be in a better position to consider whether the standards for a permanent injunction have been met.

harbor" hours. Specifically, pursuant to § 505(a) (47 U.S.C. § 561(a)), MSOs are required to "fully block the video and audio portion of [an adult entertainment] channel so that one not a subscriber to such channel or programming does not receive it." If an operator cannot fully block its adult channels, it must then, pursuant to § 505(a) (47 U.S.C. § 561(b)), discontinue programming "during the hours of the day . . . when a significant number of children are likely to view it." The FCC regulation implementing this alternative would limit adult programming to the eight hour period between 10:00 p.m. and 6:00 a.m. We will refer to the requirement found in subsection (a) as "complete scrambling," and the alternative offered by subsection (b), as "time channeling."

## The Technological and Economic Impacts of § 505

19. There are MSOs that already meet the requirements of § 505. For example, Steven Saril, Senior Vice President of Sales and Marketing for Graff, testified that roughly half of the systems carrying Graff programming are in compliance with § 505.[17] For the MSOs that are not in compliance, several technologies may become available in the future that would allow an MSO to meet the requirements of § 505. Television manufacturers may soon be required by law to insert the so-called "v-chip," in all new televisions. Pub.L. No. 104–104, § 551, 110 Stat. at 139–41. The v-chip will allow parents to block types of programming which they find inappropriate for their children. The v-chip is currently being tested in Canadian markets. It is not clear, however, how long it will be before televisions with v-chips become widely available in the United States.

20. Digital cable technology is another future option that will permit MSOs to completely scramble signals to nonsubscribers as § 505 requires. Approximately 2 million American consumers presently receive digital television service. Digital signals will prevent all audio and video bleeding, but digital service will require conversion of the MSOs' headend equipment from analog to digital technology. As MSOs adopt digital service, they will probably use it first for premium channels, including adult programming.

21. Because the currently used "RF" and "baseband" technologies are not capable of fully scrambling both the audio and video signal at all times, many MSOs would be required, if § 505(a) was enforced today, to resort to other and/or additional scrambling techniques. If an MSO was not able or willing to initiate additional scrambling techniques, it would be required to time channel adult programming.

22. One device which has been available for several years and which succeeds in fully scrambling unwanted cable signals is the lockbox. Since the early 1980s, MSOs have been required by law to provide a lockbox to any customer upon request. Section 544(d) of the 1984 Cable Act requires that cable operators either sell or lease a blocking device to any subscriber who requests that a channel be completely blocked. See 47 U.S.C. § 544(d)(2)(A). However, few households have obtained the lockboxes made available by this provision.

23. Section 504 of the CDA also requires MSOs to completely block upon request any programming that a cable customer finds personally offensive. This blocking requirement is not limited to the "sexually explicit adult video service programming" which is the target of § 505. Pub.L. No. 104–104, § 504, 110 Stat. 56, 136 (1996). Moreover, under § 504, the MSO, rather than the subscriber, is responsible for bearing the cost of providing the blocking mechanism.[18] Despite this economic burden, plaintiffs suggest

17. Saril also testified that the Spice network might go out of business if the non-complying channels were required to time channel. The Graff "standard agreement," however, requires an MSO to carry Spice only during the hours of 9 p.m. to 3 a.m.—hours that are very close to the safe harbor time period.

18. Section 504(a) provides:

(a) SUBSCRIBER REQUEST.—Upon request by a cable service subscriber, a cable operator shall, without charge, fully scramble or otherwise fully block the audio and video programming of each channel carrying such programming so that one not a subscriber does not receive it.
Pub.L. No. 104–104, § 504, 110 Stat. 56, 136 (1996) (emphasis added).

that § 504 presents a constitutional, "less restrictive alternative" because it would require an MSO to provide complete blocking only upon request. Plaintiffs also assert that cable subscribers can be alerted through public relations efforts that blocking devices will be made available to them, free of charge, upon request. Methods of disseminating this information could include inserts in program guides and bills, informative screens shown on "barker channels", advertisements run on other channels, and special mailings. We have not, however, received evidence that MSOs are advising cable customers of the availability of the free channel blocks under § 504. Nor is there evidence that customers are responding to such notices, if given. Thus, we cannot effectively assess plaintiffs' claim that § 504 is likely to become a viable remedy for eliminating signal bleed. If the § 504 blocking option is not being promoted, it cannot become a meaningful alternative to the provisions of § 505. At the time of the permanent injunction hearing, further evidence of the actual and predicted impact and efficacy of § 504 would be helpful to us.

24. MSOs that adopted the lockbox remedy, in order to comply with § 505, would be required to provide *all* nonsubscribers with a lockbox programmed to block the audio and video signals of adult entertainment networks. A mapping converter with a lockbox feature allows parents to control when adult programming will be received and when it will be blocked. Most lockboxes currently available are capable of blocking only signals entering the television set to which the box is attached. In order to fully block access to sexually oriented programming at all times, each cable-connected TV set in the home would have to be connected to a lockbox. A single converter/lockbox costs approximately $115. If MSOs that offer adult programming were to distribute one converter/lockbox to every nonsubscribing household currently without one, the total cost would be prohibitive, probably in excess of one billion dollars.

25. In the alternative, MSOs could provide "negative traps" to nonsubscribers. A "negative trap" is installed on the cable wiring of non-subscribing households and scrambles a clear signal. Subscribers to adult channels receive the clear signal without the negative trap. Negative trapping costs between $12 and $15 per household. It is an economically feasible solution only in areas, such as military bases, where a large majority of cable subscribers want to receive the adult channel.

26. Double scrambling with "positive trap" technology provides the most workable alternative for non-complying MSOs. To achieve double scrambling, RF or baseband scrambling is combined with a jamming signal at the headend. The headend jamming completely blocks video and audio so that no signal bleed occurs in the homes of non-subscribers. In order for a subscriber to view programming that has been double scrambled, the subscriber needs both a positive trap and an addressable converter. The positive trap filters out the interference from the jamming signal, and the addressable converter descrambles the RF or baseband scrambling. The addressable converter can be used to start up and end periods of premium service and also to permit pay-per-view reception. Positive trap technology would be economically advantageous in areas where nonsubscribers outnumber subscribers. If the positive trapping alternative were adopted by an MSO, positive traps would be delivered to or installed at all households subscribing to adult programming. The average cost of a positive trap is $7. A positive trap is easily installed by the subscriber or it can be installed by the MSO at a cost of approximately $35. The cost of the additional equipment necessary for jamming at the MSO's headend is estimated to be $750 to $1,000.

27. Positive trapping technology poses an additional problem for pay-per-view purchases. Customers either have to pick up a positive trap or order it in advance of viewing the desired program. This interferes with the spontaneous nature of what plaintiffs consider to be the impulse purchasing of sexually explicit adult programming.

28. Professional installation of traps also raises privacy concerns. A subscriber, who enjoys adult entertainment at home, might be dissuaded from requesting a positive trap

upon realizing that the MSO will learn his or her identity. The new subscriber will be identified as a consumer of sexually explicit material—although with sexually explicit premium and pay-per-view programming, the subscriber will also be identifiable through billing for the programming.

29. A few MSOs have already adopted "double scrambling" to resolve community opposition to sexually explicit programming and to the audio and/or video bleeding of signals from such programming. Plaintiffs contend that in these double-scrambling communities revenues from adult channels has fallen by fifty per cent. Plaintiffs are of the opinion that a significant factor causing this drop in revenue is the impulse nature of the purchase of adult programming.

30. Finally, an MSO has the option of complying with § 505 by "time channeling" as provided in subsection (b). If an MSO cannot or chooses not to completely scramble audio and/or video signals as required by § 505(a), it must restrict adult program to certain "safe harbor" hours. In preparation for implementing § 505, the FCC established a regulation that defines the safe harbor hours as the eight hour period between 10:00 p.m. and 6:00 a.m. *In re Implementation of Section 505 of the Telecommunications Act of 1996,* CS Dkt. No. 96–40, FCC 96–84, Order & Notice of Proposed Rulemaking amending 47 C.F.R. § 76 ¶ 6 (released March 5, 1996; intended to become effective March 9, 1996). If time channeling were adopted by an MSO, adult cable programming would not be available in the MSO's service area except during the safe harbor hours. Plaintiffs estimate that their revenues would fall approximately thirty per cent if time channeling were adopted.[19]

31. The MSOs that have taken a position on the method by which they would comply with § 505 have all announced that they would adopt time channeling.

## III.

## CONCLUSIONS OF LAW

### A. The Preliminary Injunction Standard

Playboy and Graff have asked this court to exercise extraordinary judicial authority by striking down a law drafted and adopted by a co-equal branch of government. The plaintiffs' request raises one of the judiciary's most "awesome responsibilit[ies] calling for the utmost circumspection in its exercise." *Heart of Atlanta Motel, Inc. v. United States,* 85 S.Ct. 1, 2, 13 L.Ed.2d 12 (1964). After thorough examination and discussion, we conclude that, at this preliminary injunction stage, we will not strike down § 505. As the case has presently been developed before us, the plaintiffs have not met the requirements for the issuing of a preliminary injunction. We will, therefore, deny their petition for preliminary relief.

The standard used to determine whether plaintiffs are entitled to a preliminary injunction is well established. In order to succeed, plaintiffs must demonstrate that they are likely to prevail on the merits and that they will suffer irreparable harm if they are not granted injunctive relief. We must also consider whether the potential harm to the defendant that will result from the issuing of a preliminary injunction outweighs the harm that may fall upon the plaintiffs if such relief is denied, and whether granting the requested injunctive relief is in the public interest. *American Civil Liberties Union v. Reno,* 929 F.Supp. 824, 851 (E.D.Pa.1996) (citing *Campbell Soup Co. v. ConAgra, Inc.,* 977 F.2d 86,

---

19. We are skeptical of plaintiffs' estimate of revenue loss. It appears to be significantly overstated. Although Graff's Vice President, Steven Saril, stated that 30 percent of those who purchase his company's programming do so outside the safe harbor hours, many of these customers may not be affected by time channeling because half of the cable systems carrying Graff channels, already comply with § 505(a). The customers of these MSOs will still be able to view Graff's channels outside the safe harbor period. Moreover, Saril admitted on cross-examination that 21% of the non-safe-harbor purchases occur at 9:00 or 9:30 p.m., and that a 10:00 p.m. starting time would cause no loss of revenue. He further admitted that people may rearrange their viewing schedule or use a VCR to tape adult programming during the safe harbor hours, again preserving Graff's revenues. Finally, plaintiffs acknowledge some remaining elasticity in the pricing of sexually explicit programming. Graff would be able raise its rates a certain extent without losing customers.

90–91 (3d Cir.1992) and. *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir.1990)); *see also Clean Ocean Action v. York,* 57 F.3d 328, 331 (3d Cir.1995).

■ In a case such as this one, in which the alleged injury is a threat to First Amendment interests, the finding of irreparable injury is often tied to the likelihood of success on the merits. *American Civil Liberties Union,* 929 F.Supp at 851 (citing *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). The loss of First Amendment freedoms is unquestionably irreparable injury. *Elrod,* 427 U.S. at 373, 96 S.Ct. at 2689–90 (citing *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) ). Conversely, however, if the only irreparable injury alleged is the loss of first amendment freedoms, the likelihood that plaintiffs will not succeed on the merits creates an equal likelihood that they will not suffer First Amendment injury.[20] Constitutional injury cannot occur if there is not a constitutional violation. We will, for this reason, turn our inquiry first to the issue of the plaintiffs' likelihood of success on the merits.

Plaintiffs challenge § 505 on grounds that it (1) infringes the free speech protections provided by the First Amendment of the U.S. Constitution, (2) violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, and (3) contains unconstitutionally vague terminology. With regard to all three of these claims, we conclude that Playboy and Graff have failed to meet the preliminary injunction test. They have not persuaded us that they are likely to prevail on the merits if any of these three claims are ultimately litigated. Moreover, they have not demonstrated that the public interest is served by permitting signal bleed to invade nonsubscribers' homes, particularly in view of our interest in protecting children from a pervasive medium which transmits sexually explicit sounds and images and in view of the continuing availability under § 505 of sexually explicit adult programming during the safe harbor hours.[21]

**B. First Amendment Jurisprudence**

Playboy and Graff claim that § 505 burdens their rights guaranteed under the First Amendment by inhibiting their freedom of speech. The First Amendment provides: "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The Supreme Court has been exacting in its protection of this First Amendment right. Moreover, as circumstances and technologies have changed, the Court has adapted free speech protection to meet these changes.

We postponed our decision here until the Supreme Court reached its decision in a case dealing with a similar field of developing technology—that of leased and public access cable channels. *See Denver Area Educational Telecommunications Consortium, Inc. v. F.C.C.,* — U.S. —, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) [hereinafter *Denver Consortium*]. In *Denver Consortium,* the plaintiffs challenged three sections of the Cable Television Consumer Protection and Competition Act of 1992, which placed restrictions upon indecent programming aired on leased and public access cable channels.[22]

**20.** Plaintiffs also claim that they will suffer financial loss. Financial loss is not, however, the type of irreparable injury that warrants the granting of injunctive relief. *See, e.g., In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1145 (3d Cir.1982). To the extent that plaintiffs may suffer financial loss for which they will not be reimbursed, that economic burden is an element which we considered *infra* in the balancing of harms, particularly in our discussion of the benefit to the public of time channeling (per *F.C.C. v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978)) and its availability under § 505 as an alternative to complete scrambling.

**21.** In our discussion, we do not separate out the elements to consider with regard to the issuing of an injunction, *i.e.,* likelihood of success on the merits, irreparable harm, balancing of harms, and public interest. First, in this context of a claim of unconstitutional restriction of free speech, the harm and public interest elements are important factors in determining the likelihood of success on the merits. These factors will therefore be discussed in conjunction with the merits of the claims. Second, as we note above, our irreparable harm analysis is subsumed by our finding that plaintiffs are not likely to succeed on the merits.

**22.** The plaintiffs in *Denver Consortium* challenged sections 10(a), 10(b), and 10(c) of the 1992 Cable Act. These provisions were to be applied to "leased access channels" and "public,

Pub.L. No. 102–385, 106 Stat. 1460, 1486, §§ 10(a), 10(b), and 10(c) (codified at 47 U.S.C. §§ 532(h), 532(j), and note following § 531) ("the 1992 Cable Act"). A majority of the Supreme Court agreed that § 10(b) of the 1992 Cable Act was unconstitutional, but the Court was unable to form a majority regarding the constitutionality of the remainder of the Act.[23]

Justice Breyer wrote for the Court regarding § 10(b), but thereafter he wrote for a plurality, which upheld § 10(a) and struck down § 10(c). One of the seemingly unresolved aspects of *Denver Consortium* is the standard of scrutiny we should apply in our analysis here. The plurality suggested that it was "unwise and unnecessary" to decide whether a lower standard of scrutiny, such as that applied in *F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), should apply in the cable context. *Denver Consortium*, —— U.S. at ——, 116 S.Ct. at 2385. It was unnecessary to specify a specific standard because § 10(b) could not pass constitutional muster either under strict scrutiny or under a less rigorous standard. And, it was unwise to declare a "rigid single standard" for fear of dampening the rapid rate of development in the field of communications technologies.

The other five members of the Court suggested that strict scrutiny remained the applicable standard where a law restricted speech on the basis of its content. Thus, these members of the Court would have required that the law be "narrowly tailored" to achieve a "compelling" government interest in order to survive constitutional review. Justice Thomas, joined by Chief Justice Rehnquist and Justice Scalia believed that all three challenged provisions of the 1992 Cable Act were constitutional and that even § 10(b) would survive strict scrutiny. *See id.* at ——, —— — —— & ——, 116 S.Ct. at 2422, 2428–29 & 2432 (Thomas, J., concurring in part and dissenting in part). Justice Kennedy, joined by Justice Ginsburg, would have held to the contrary that strict scrutiny was fatal to the challenged provisions and all three should be struck down. *See id.* at —— — ——, —— — ——, & ——, 116 S.Ct. at 2405–07, 2416–17, & 2419 (Kennedy, J., concurring in part and dissenting in part). In the aftermath of the *Denver Consortium* decision, it is clear only that we should apply either strict scrutiny or something very close to strict scrutiny when a content-based law, applicable in the cable television context, is challenged on grounds that it violates the First Amendment.[24]

educational, or governmental channels" ("PEG channels"). Section 10(a) "permit[s] a cable operator to enforce prospectively a written and published policy of prohibiting programming [on leased access channels] that the operator reasonably believes describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards." 1992 Cable Act, § 10(a)(2).

Section 10(b) requires that, if cable operators choose not to ban sexually explicit programming as permitted under § 10(a), when they broadcast such programming on leased access channels, they must completely segregate and block the signal carrying the indecent programming. 1992 Cable Act, § 10(b). According to regulations promulgated pursuant to § 10(b), leased access programmers must inform cable operators if their programming will be indecent, and cable operators must then place that programming on a single channel. 47 C.F.R. § 76.701(d) (1995). The signal of this single channel must be completely blocked by the cable operator, and unscrambled only upon the written request of an adult subscriber. *Id.* at § 76.701(b). Upon receiving a subscriber's request, the operator must provide access to the blocked channel within thirty days and, if that subscriber later asks that

the channel be re-blocked, the operator must accommodate the subscribers request, again within 30 days. *Id.* at § 76.701(c).

Section 10(c) is similar to § 10(a) but applies only to PEG channels. It instructs the F.C.C. to enact regulations that would permit a cable operator "to prohibit the use, on [a cable system], of any channel capacity of any public, educational, or governmental access facility for any programming which contains obscene material, sexually explicit, conduct, or material soliciting or promoting *unlawful conduct.*" 1992 Cable Act, § 10(c).

**23.** Unlike leased and public access channels, the Graff and Playboy networks are commercial premium channels. The segregation of adult programming and the scrambling of adult channel signals, which concerned the Court in *Denver Consortium*, is, in the context of adult channels, a commercial decision which MSOs have made in order to limit access to those viewers who pay to subscribe to the adult channels.

**24.** We recognize that several Supreme Court pluralities have suggested that sexually explicit material receives less protection under the First

However, whatever the standard of scrutiny, as Justice Breyer stated for the Court in *Denver Consortium:* "The essence of that protection is that Congress may not regulate speech except in cases of extraordinary need and with the exercise of a degree of care that we have not elsewhere required." *Id.* at ———, 116 S.Ct. at 2384.

The first step that the majority took in *Denver Consortium* was to scrutinize the statute to assure that it properly addressed "an extremely important problem, without imposing, in light of the relevant interests, an unnecessarily great restriction on speech." *Id.* at ———, 116 S.Ct. at 2385. The Court defined the problem as the protection of children from exposure to patently offensive depictions of sex. *Id.* It was to address this same problem that Congress enacted § 505.

Section 505 differs, however, from the statute at issue in *Denver Consortium* and from most statutes that are directed at speech or at the regulation of speech in that the target of § 505 is not the speech itself, *i.e.,* sexually explicit adult programming. The target is signal bleed, a secondary effect of the transmission of that speech. Moreover, § 505 is directed at this secondary effect because signal bleed is intruding into the homes of television viewers who have chosen *not* to receive the underlying sexually explicit programming.

This focus of § 505 on a secondary effect of speech leads us to our next inquiry, whether § 505 is "content-based" or "content-neutral." *See City of Renton v. Playtime The-*

atres, Inc., 475 U.S. 41, 47, 106 S.Ct. 925, 928–29, 89 L.Ed.2d 29 (1986). As we have noted, in *Denver Consortium* five justices agreed that a content-based strict scrutiny standard should apply. We conclude here, but not without considerable deliberation, that § 505 should be treated as a content-based restriction on speech. Even though § 505 is aimed at the content-neutral objective of preventing signal bleed, the section applies only when signal bleed occurs during the transmission of "sexually explicit adult programming or other programming that is indecent." It does not apply when signal bleed occurs on other premium channel networks, like HBO or the Disney Channel. Thus, Congress targeted signal bleed based on its sexually explicit content, rendering § 505 a "content-based" restriction. We will therefore apply content-based analysis.

We must, however, also consider content in context. We cannot ignore the fact that the households that receive signal bleed have not subscribed to the adult channel which transmits the unwanted images and sounds. Nor can we ignore the fact that cable television is a means of communication which is pervasive and to which children are easily exposed. The Supreme Court has recognized that cable television is as accessible to children as over-the-air broadcasting, if not more so. *See Denver Consortium,* ——— U.S. at ———, 116 S.Ct. at 2386.

Moreover, the Supreme Court in its consideration of freedom of speech under the

Amendment than, for example, artistically, politically, or scientifically valued forms of speech. For example, in *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), a plurality of the Court explained:

> [E]ven though we recognize the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate that inspired Voltaire's immortal comment ["I disapprove of what you say, but I will defend to the death your right to say it."]. Whether political oratory or philosophical discussion moves us to applaud or to despise what is said, every schoolchild can understand why our duty to defend the right to speak remains the same.

> But few of us would march our sons and daughters off to war to preserve the citizen's right to see "Specified Sexual Activities" exhibited in the theatres of our choice. Even though the First Amendment protects communication in this area from total suppression, we hold that the State may legitimately use the content of these materials as the basis for placing them in a different classification....

*Id.* at 70–71, 96 S.Ct. at 2452. This plurality also noted that "[e]ven within the area of protected speech, a difference in content may require a different governmental response." *Id.* at 66, 96 S.Ct. at 2450. The plurality opinion in *Pacifica Foundation* similarly suggested that a lower standard of scrutiny may be appropriately applied in certain contexts when the content of the regulated material is offensive, vulgar, or shocking. *See Pacifica Foundation,* 438 U.S. at 744–48, 98 S.Ct. at 3037–40.

First Amendment has recognized the need to protect children from sexually explicit material, particularly in the context of a pervasive medium. *See Denver Consortium,* —— U.S. at ——, 116 S.Ct. at 2386 ("[T]he provision before us comes accompanied with an extremely important justification, one that this Court has often found compelling—the need to protect children from exposure to patently offensive sex-related material."); *Sable Communications of Cal., Inc. v. F.C.C.,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989) ("We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors. This interest extends to shielding minors from the influence of literature that is not obscene by adult standards."); *New York v. Ferber,* 458 U.S. 747, 756–57, 102 S.Ct. 3348, 3354–55, 73 L.Ed.2d 1113 (1982) ("It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" (citation omitted)); *Fabulous Assocs. Inc. v. Pa. Pub. Util. Comm'n,* 896 F.2d 780, 787 (3d Cir.1990) ("There is little question that the interest of the state in shielding its youth from exposure to indecent materials is a compelling state interest.").

Nor are the courts alone in finding that children should be protected from exposure to sexually explicit materials. In 1986, the Attorney General's Commission on Pornography issued a final report that reached similar conclusions regarding the effects of "non-violent and non-degrading," sexually explicit materials on children. The Commission explained:

Perhaps the most significant potential harm in this category exists with respect to children. We all agree that at least much, probably most, and maybe even all material in this category, regardless of whether it is harmful when used by adults only, is harmful when it falls into the hands of children.... We have no hesitancy in concluding that learning about sexuality from most of the material in this category is not the best way for children to learn about the subject. There are harms both to the children themselves and to notions of family control over a child's introduction to sexuality if children learn about sex from the kinds of sexually explicit materials that constitute the bulk of this category of materials.

We have little doubt that much of this material does find its way into the hands of children, and to the extent that it does we all agree that it is harmful. We may disagree about the extent to which people should, as adults, be tolerated in engaging in sexual practices that differ from the norm, but we agree about the question of the desirability of exposing children to most of this material, and on that our unanimous agreement is that it is undesirable.

U.S. Dept. of Justice, *Attorney General's Commission on Pornography,* July 1986, at 343–44 (Def.'s Ex. 80).[25]

■ As a result, we conclude that § 505 clearly addresses a recognized "compelling interest," and it remains only for us to determine whether the provision is carefully tailored to serve that end. For the reasons that we now develop, and particularly on the

---

**25.** In considering harm to children, we have not relied on the study conducted by Government's expert witness, Dr. Diana M. Elliott, Ph.D. *See* Diana M. Elliott, *Children's Exposure to Pornography: Prevalence and Impact* (Def.'s Ex. 79). We understand, as she testified, that it would be unethical to expose children to pornography in order to test their reactions to sexually explicit material, but, for a number of reasons, we have concerns regarding the reliability of her methods and conclusions. Her results strike us as anecdotal and possibly misleading. Because the parties stipulated prior to the preliminary injunction hearing that all evidence submitted would be admissible, we did not consider the admissibility of her study under the rules established in *Dau-*

*bert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). Instead, the reliability concerns that the court had regarding Dr. Elliott's research were considered only in weighing the evidence. We ultimately decided that her research should not be given weight in coming to our present decision.

If plaintiffs plan to seek a hearing in order to request a permanent injunction before this panel, it would be helpful if the parties would provide the court with additional evidence demonstrating the effects of sexually explicit materials on children.

basis of the Supreme Court's ruling in *F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), we hold that Congress has adopted, at least in respect to § 505(b), a carefully tailored, and constitutional, solution.[26]

In *Denver Consortium*, a plurality of the Supreme Court acknowledged that case's similarity to *Pacifica Foundation*, noting that, like the broadcast system at issue in *Pacifica Foundation*, "[c]able television systems ... 'have established a uniquely pervasive presence in the lives of all Americans.'" *Denver Consortium*, —— U.S. at ——, 116 S.Ct. at 2386 (quoting *Pacifica Foundation*, 438 U.S. at 748, 98 S.Ct. at 3039–40). It was largely the pervasive nature of broadcast media that motivated the Court in *Pacifica Foundation* to uphold governmental restrictions placed on radio broadcasts of indecent material.

We wholeheartedly agree with the plurality's finding in *Denver Consortium* that cable television is now "uniquely pervasive." *Id.* The plurality also noted that "[c]able television broadcasting ... is as 'accessible to children' as over-the-air broadcasting if not more so." *Id.* Justice Souter further explained:

> [W]hile we have found cable television different from broadcast with respect to the factors justifying intrusive access requirements under the rule in *Red Lion [Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) ], *see Turner Broadcasting System, Inc. v. F.C.C.*, [512 U.S. 622, —— ——, 114 S.Ct. 2445, 2456–57, 129 L.Ed.2d 497 (1994) ] (finding that *Red Lion*'s spectrum scarcity rationale had no application to cable), today's plurality opinion rightly observes that the characteristics of broadcast radio that rendered

indecency particularly threatening in *Pacifica*, that is, its intrusion into the house and accessibility to children, are also present in the case of cable television.

*Id.* —— U.S. at —— — ——, 116 S.Ct. at 2401–02 (Souter, J., concurring) (citation omitted).

There is no question that a commanding majority of households in this nation subscribe to cable programming. As a result of imperfect signal scrambling, millions of children then have potential access not only to indecent sounds, similar to those raising concern in *Pacifica Foundation*, but also to sexually explicit visual images. In the homes of families who do not subscribe to sex-dedicated networks, these images enter as an offensive pollutant. They invade the household and "confront[ ] the citizen ... in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder." *Pacifica Foundation*, 438 U.S. at 748, 98 S.Ct. at 3040; *see also Denver Consortium*, —— U.S. at ——, 116 S.Ct. at 2386 (plurality opinion).

In *Pacifica Foundation*, the Supreme Court found it undisputed that George Carlin's "Filthy Words" monologue was "vulgar," "offensive," and "shocking." 438 U.S. at 747, 98 S.Ct. at 3039. The Court noted that, in the right context, the speech deserved First Amendment protections, providing adult listeners with a right to find Carlin's observances funny and provocative, instead of vulgar and offensive. The Court therefore examined the context of the monologue, broadcast at 2 o'clock in the afternoon. It emphasized the ubiquitous nature of broadcast radio and recognized that airing Carlin's performance at the time "could have

---

26. The Supreme Court held in an earlier "secondary effects" decision, regarding the exposure of the unwilling viewer to nudity, that a city ordinance was invalid which barred the exhibition in drive-in theaters of motion pictures in which human male or female bare buttocks, human female bare breasts, or human bare pubic areas were shown if the motion picture was visible from any public street or public place. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). We find the present case distinguishable from *Erznoznik* in

that it is not an occasional glimpse of a portion of nude anatomy which is visible in the signal bleed from adult channels, but instead it is an unbroken continuum of sexually explicit sounds and images, delivered without invitation to one's home rather than to passers-by on a public highway. We believe it is likely that if the Jacksonville ordinance at issue in *Erznoznik* had been directed solely at the display of 100% sexually explicit films which were visible from the public street and from private homes, the ordinance would have been held to be valid.

enlarged a child's vocabulary in an instant." *Id.* at 749, 98 S.Ct. at 3040.

Similarly, when cable signal bleed occurs, children may be exposed to the sights and sounds of sexually explicit films and other adult programming. Such programming has the potential to affect not only a child's vocabulary, but also his or her capacity for inappropriate conduct that is sexual in nature. We believe that the danger of prematurely exposing children to video and audio transmissions of graphic adult sexual behavior is even more troublesome than the exposure to offensive language that was at issue in *Pacifica Foundation.*

Indeed, the parties do not dispute that the government has a well-established compelling interest in protecting children from unsupervised exposure to sexually explicit material.

We then turn to the solution which Congress crafted in § 505. Congress provided MSOs with two alternative methods of compliance with the section: (1) complete scrambling, or (2) time-channeling the programming into safe-harbor hours. Playboy and Graff argue that very few MSOs will be financially able to comply with § 505 by distributing expensive equipment that will fully scramble the signals of sex-dedicated networks as required by subsection (a). Plaintiffs fear that MSOs will drop adult programming entirely, rather than invest in technologies which will be made obsolete by the v-chip or that MSOs will transmit plaintiffs' networks for an unprofitably short eight-hour period. Not only do the plaintiffs foresee lost profits, they present the possibility of bankruptcy caused by implementation of § 505.

There is undoubtedly a substantial expense involved in complying with subsection (a). However, while an economic burden may warrant consideration when weighing the relative harms imposed by a law, economics alone cannot dictate the result where constitutional rights are at issue. *See Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 78, 96 S.Ct. 2440, 2456, 49 L.Ed.2d 310 (1976)

(Powell concurring); *Mitchell v. Comm'n on Adult Entertainment Establishments,* 10 F.3d 123, 144 (3d Cir.1993).[27] Moreover, § 505 does *not* require that MSOs shoulder potentially fatal economic burdens. If the economic hardship imposed by subsection (a) is too severe, an MSO is free to choose to comply with § 505 by time-channeling in accordance with subsection (b).

By including the time-channeling compliance option in § 505, Congress provided MSOs with decision-making flexibility and an economically less restrictive alternative. We thus find that the economic burden placed on MSOs by subsection (a) is not determinative of the result in light of the substantially less expensive option provided by time-channeling in subsection (b). It follows therefore that if the time-channeling alternative provides a constitutional means of compliance with § 505, then § 505 is constitutional.

Time-channeling was explicitly approved by the Supreme Court as a constitutional restriction on pervasive indecent speech in *Pacifica Foundation.* There, the Supreme Court found that one of the most troubling aspects of the Carlin broadcast was the early afternoon hour at which it was aired. Shown at that time, the broadcast was " 'like a pig in a parlor instead of the barnyard.' " *Pacifica Foundation,* 438 U.S. at 750, 98 S.Ct. at 3041 (quoting *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926)). The F.C.C. opinion challenged by the Pacifica Foundation did not intend to ban future indecent broadcasts entirely but merely sought to channel them into a safe-harbor period during which significant numbers of children would not be listening. *Id.* 438 U.S. at 732, 98 S.Ct. at 3031–32 (citing 59 F.C.C.2d 892 (1976)). The Supreme Court held that time-channeling was an appropriate response to the problem presented. It therefore approved the F.C.C. attempt to prevent the airing of offensive programming on a pervasive form of communication at a time of day when children were likely to be listening.

---

**27.** While we are aware that *Young* and *Mitchell* are zoning cases, we consider that their holdings on economic impact are relevant in that, as is the

statute at issue in this case, the regulations there were directed at competing concerns of public welfare rather than at the speech itself.

Because the Supreme Court endorsed a time-channeling solution in very similar circumstances in *Pacifica Foundation*, we believe that time-channeling also survives constitutional scrutiny here. It is important to our reasoning that § 505 does not seek to ban sexually explicit programming, nor does it prohibit consenting adults from viewing erotic material on premium cable networks if they so desire. It is clearly established that a complete ban on indecent speech will rarely (if ever) be tolerated. *See Denver Consortium*, —— U.S. at ——, 116 S.Ct. at 2387 (plurality opinion) (suggesting that § 10(a) passed constitutional muster in part because it gave a cable operator the flexibility to choose not to ban indecent broadcasts, but rather "to rearrange broadcast times, better to fit the desires of adult audiences while lessening the risks of harm to children); *id.* at ——, 116 S.Ct. at 2423 (Thomas, J., concurring in part and dissenting in part) ("Certainly, under our current jurisprudence, Congress could not impose a total ban on the transmission of indecent programming."); *Sable Communications*, 492 U.S. at 127, 109 S.Ct. at 2837 (holding total ban on indecent telephone communications to be unconstitutional and distinguishing the time-channeling remedy approved in *Pacifica Foundation* on grounds that it "did not involve a total ban on broadcasting indecent material."); *Young*, 427 U.S. at 70, 96 S.Ct. at 2452 (finding that the First Amendment protects communication in the area of sexually oriented materials from total suppression). The time-channeling alternative in § 505 explicitly allows MSOs to continue transmitting sex-dedicated networks. Section 505 thus leaves the speaker and the listener with an opportunity to maintain sufficient adult communication, while respecting the privacy interests of those who might be offended or inappropriately exposed. We believe the law thus

strikes a permissible balance of constitutional interests.

The plaintiffs contend, nevertheless, that § 504 is a less restrictive option which is available to provide protection from signal bleed. They urge, therefore, that we declare § 505 invalid. However, the cost to MSOs of creating an adequate shield from a widespread intrusion of signal bleed by supplying converter/lockboxes to households that don't subscribe to adult channels, would be close to the expense of providing converter/lockboxes to non-subscribing households under § 505(a). The main difference is that under § 504 the household has to request the box, while under § 505 the MSO must provide the box.[28] We have no evidence in the present record that local cable operators or producers of sexually explicit programming are advertising the free availability of the § 504 lockbox or other blocking devices upon demand. Likewise, there is no evidence that parents are otherwise aware of the § 504 means of achieving complete blocking of undesired channels. Upon this record, the government has demonstrated an expectation that § 504 will not be a viable alternative.

Moreover, in view of the fact that children watch television in the homes of their friends as well as in their own homes, we do not find Congress to have been unreasonable in wishing to extend protection from signal bleed beyond a child's own home.

Furthermore, Congress enacted, as one of the regulatory options, time channeling, which the Supreme Court had in *Pacifica Foundation* held to be a constitutionally acceptable way of protecting children from a pervasive, sexually explicit medium. Therefore, even if § 505(a) does not pass constitutional analysis, § 505(b) does.

Given the content of adult programming and the pervasive nature of cable television,

---

**28.** Plaintiffs also assert that Congress found, in § 551(a)(8) & (9) of the Act, that there is a compelling governmental interest in empowering parents to control the television viewing by their children, such as by providing parents with technological tools that allow them to easily block violent, sexual or other programming that they believe harmful to their children. Section 504 was one such mechanism, and the development of v-chip technology will be another. Congress

recognized, as Senator Feinstein's remarks indicated, *supra*, that many parents are unaware of the problem of sexually explicit signal bleed and its accessibility to children of non-subscribers of sexually-dedicated channels. The parental control option is viewed as an adjunct of lesser efficacy because its exercise requires knowledge and the taking of affirmative steps such as requesting the blocking device from the MSO.

we find that § 505 is an acceptable governmental response intended to prevent exposure of minors to sexually explicit signal bleed. We therefore conclude that plaintiffs have failed to show that they are likely to succeed in their claim that the provision violates their First Amendment rights to freedom of speech.[29]

## C. Fourteenth Amendment Equal Protection Jurisprudence

Likewise, plaintiffs have not persuaded us that they can succeed on the merits of their claim that § 505 violates their rights guaranteed by the Equal Protection Clause. Playboy and Graff argue that other premium channel networks carry adult-oriented programming but that § 505 will not restrict the speech of these networks. They claim, for example, that HBO and Showtime present programming that is an equivalent to the sexually oriented programming shown on the Playboy networks and on Spice, and that this programming is shown at hours outside of the safe-harbor period. They assert that legislation directed at them, but not at these other premium networks, denies them equal protection of the laws. *See, e.g., News America Pub., Inc. v. F.C.C.*, 844 F.2d 800, 813 (D.C.Cir.1988) ("The safeguards of a pluralistic political system are often absent when the legislature zeroes in on a small class of citizens.") (citing *Railway Express Agency v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949)).

There is, however, a significant difference between plaintiffs' networks and the non-adult premium networks. The plaintiffs admit that *all* of the programming shown on their networks—in some cases, twenty-four hours per day—is "adult programming." Transcript of Preliminary Injunction Hearing 201–02 (D.Del. May 20, 1996) (testimony of Steven Saril, Senior Vice President of Sales and Marketing for Graff); *see* Deposition of Anthony J. Lynn, President of Playboy En-

tertainment Group, Inc. at 124–25 (Def.'s Ex. 72) (stating that sexually explicit programming aired on AdulTVision "is at risk of being defined as sexually explicit" under § 505); Plaintiff Graff Pay–Per–View Inc.'s Answers to Defendants' First Set of Interrogs. at 6 (Def.'s Ex. 43) (responding that 100% of Graff's programming contains material that is "sexually oriented"). On the premium channels, however, sexually explicit shows constitute only a fraction of the programming. For example, only one sixteenth of the programming on the non-adult cable channels on a Friday evening in Denver was sexually explicit. Moreover, many of the shows constituting that one-sixteenth were "R" rated movies with some sexually explicit scenes, rather than being 100% sexually explicit. Thus, it cannot be said that the non-adult channels, such as HBO and Showtime, are "primarily dedicated" to sexually explicit programming. Moreover, signal bleed from that one-sixteenth, if signal bleed occurred, would not continuously present sexually explicit scenes to the channel surfer.[30]

We find therefore that Congress was justified in initially addressing the problem of sexually explicit signal bleed by focusing on sex-dedicated networks. Section 505's "differential treatment" of plaintiffs' networks is justified by their "special characteristic" of providing nothing but sexually explicit programming intended for adult audiences. *See Turner Broadcasting*, 512 U.S. at ——, 114 S.Ct. at 2468. It is perfectly logical that Congress would begin its attempt to prevent minors from gaining access to programming intended solely for adults by focusing first on the networks that specialize in adult-only programming. "Congress need not deal with every problem at once," and Congress "must have a degree of leeway in tailoring means to ends." *Denver Consortium*, —— U.S. at ——, 116 S.Ct. at 2393 (majority opinion) (citing *cf. Semler v.*

---

**29.** We are mindful that the Supreme Court in *Denver Consortium* referred to the Telecommunications Act of 1996, including specifically § 505, as "significantly less restrictive" than § 10(b) of the 1992 Cable Act which they struck down. *See, e.g.,* —— U.S. at ——, 116 S.Ct. at 2392. However, since § 505 was not before the Court in *Denver Consortium,* this reference is dictum.

**30.** We note also that § 505 applies uniformly and without discrimination to all networks that are "*primarily* dedicated to sexually-oriented programming." Pub.L. No. 104–104, § 505, 106 Stat. at *136 (1996) (emphasis added). The law does not, for instance, favor Playboy over Graff.

*Oregon Bd. Of Dental Examiners,* 294 U.S. 608, 610, 55 S.Ct. 570, 571, 79 L.Ed. 1086 (1935) and *Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 102–03, 93 S.Ct. 2080, 2086–87, 36 L.Ed.2d 772 (1973)); *see also Williamson v. Lee Optical of Okla.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955) ("[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."); *United States v. Edge Broadcasting Co.,* 509 U.S. 418, 434, 113 S.Ct. 2696, 2707, 125 L.Ed.2d 345 (1993) (The Court does not "require that the Government make progress on every front before it can make progress on any front.").

We find that the means chosen by Congress to protect children and aid their parents was a permitted and measured response to a national problem. The cause of the problem was primarily traced to sex-dedicated networks and, understandably, Congress began its efforts to address the problem by focusing on those networks.[31] Congress thus made a logical distinction and tailored the law in an acceptable manner. As a result, plaintiffs' claim that § 505 will violate their right to equal protection of the laws is likely to fail.

### D. Vagueness Jurisprudence

After the Supreme Court's decision in *Denver Consortium,* it is clear that plaintiffs' vagueness claim will also fail on the merits. Graff noted in its Memorandum of Law in support of its Motion for a Preliminary Injunction that "the Supreme Court has before it a similar vagueness challenge in the cable indecency case," citing *Denver Consortium.* At that time, argument had been heard by the Supreme Court in *Denver Consortium,* but the decision was pending. When the Supreme Court published its decision in that case, it flatly rejected the plaintiffs' argument that the provisions challenged were unconstitutionally vague. *Denver Consortium,* —— U.S. at ——–——, 116 S.Ct. at 2389–90. The Court concluded that similar terms had been previously defined by courts and by the F.C.C. It also found the language of the statute "similar to language previously used by this Court for roughly similar purposes," referring to its decision in *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2614–15, 37 L.Ed.2d 419 (1973), among others. *Id.* —— U.S. at ——, 116 S.Ct. at 2389. Thus, the use of accepted terms imbued the statute with meaning.

In recent decisions, other members of the federal judiciary have likewise found that the term "indecent" has, over time, been sufficiently defined. *See American Civil Liberties Union v. Reno,* 929 F.Supp. at 865, 868 (Dalzell, J., concurring); *Shea ex rel. American Reporter v. Reno,* 930 F.Supp. 916, 935–36 (S.D.N.Y., 1996). As pointed out recently by a three-judge panel in the United States District Court for the Southern District of New York, federal courts have approved the F.C.C.'s definition of "indecency" and have rejected vagueness challenges to that term in the context of broadcast media, commercial telephone communications, and cable programming. *See Shea,* 930 F.Supp. at 935–36. The court in *Shea* comprehensively reviewed the precedent in this area, and we find their research and their reasoning persuasive.

■ Therefore, we conclude that § 505 does not suffer from the "vice of vagueness." The plaintiffs clearly understood that the law applied to them, and in the wake of this litigation, it is clear that the F.C.C. would apply § 505 to MSOs that carry the plaintiffs' networks. Thus, the meaning and application of § 505 should be plain to MSOs as well. Playboy and Graff have little-to-no chance of succeeding on the merits of a vagueness claim.

---

31. Furthermore, this is not a case involving governmental discrimination against a suspect class, nor is there any evidence of arbitrary or invidious governmental conduct. *See, e.g., New York City Transit Authority v. Beazer,* 440 U.S. 568, 592–93, 99 S.Ct. 1355, 1369–70, 59 L.Ed.2d 587 (1979). Therefore, we apply rational basis review and ask whether the alleged classification is "rationally related" to a "legitimate" governmental interest. In our discussion of First Amendment jurisprudence, *supra,* we applied a much higher standard of scrutiny and concluded that § 505 is constitutional. We therefore hold that § 505 is not merely rationally related to a legitimate government interest, it is carefully tailored to an interest that is widely regarded as compelling.

## VI. Conclusion

Plaintiffs have not satisfied the elements of the preliminary injunction test. We will therefore remove the temporary restraining order, which was previously granted by this court, and we will deny plaintiffs request for preliminary injunctive relief.